The People of the State of Illinois, Appellee, v. James Barnes, Appellant.

Gen. No. 50,896.

First District, Fourth Division.

June 5, 1968.

Gerald W. Getty, Public Defender of Cook County, of Chicago (James J. Doherty, Assistant Public Defender, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Howard Levine, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE McCORMICK delivered the opinion of the court.

CHARGE: Attempted robbery.*

---

* Ill Rev Stats 1963, c 38, § 18–1. Robbery. (a) A person commits robbery when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force.

(b) Penalty. A person convicted of robbery shall be imprisoned in the penitentiary from one to 20 years.

Ill Rev Stats 1963, c 38, § 8–4. Attempt. (a) Elements of the Offense. A person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense.

* See Callaghan's Illinois Digest, same topic and section number.

211

DEFENSE AT TRIAL: Alibi.

JUDGMENT: After a bench trial the court found the defendant guilty and sentenced him to a term of 1 to 8 years in the Illinois State Penitentiary.

POINT RAISED ON APPEAL: The defendant was not proved guilty beyond a reasonable doubt.

EVIDENCE FOR STATE: Patrick Edward O'Shea testified that he was 17 years old, a high school student, and was employed during the summer by a retail store as a stock boy and sales clerk. He stated that on October 28, 1964, he had worked from 3:00 to 5:30 p. m., after which he and his brother met and started to walk to their home at 4132 West Van Buren Street. When they reached the corner of Van Buren and Keeler, where a tavern is located, the defendant, James Barnes, came off the street between two parked cars, and walked toward the witness, grabbed his arm and asked if he had any money or valuables; when the witness said he did not, the defendant told him to give him his leather jacket, and the witness refused. The defendant then pulled a small steel automatic gun from his pocket and again demanded the jacket, saying that he would "burn" him. Both the witness and his brother ran, at which time the defendant started shooting, hitting the witness once, causing him to fall, with a bullet in his spine where it still remained at time of the trial. The jacket with the bullet hole in the back was introduced in evidence.

The witness stated that after he was taken to the hospital the police brought in three suspects all of the same height, shape and size, and that he positively identified one of them (the defendant) as the boy who shot him. He told the police that the defendant on the night of October 28, was wearing "something black with

. . .
(c) Penalty. A person convicted of an attempt may be fined or imprisoned or both not to exceed the maximum provided for the offense attempted: . . .

an emblem, an eagle emblem on it." The police brought the defendant into the hospital room, then later brought in a sweater which had a red emblem on the breast and a big eagle emblem on the back. The witness identified the sweater as the one the defendant was wearing at the time of the shooting.

On cross-examination Patrick O'Shea testified that he never recalled having seen the defendant before; that on the night in question the defendant was wearing the black sweater and something over it which was partially buttoned; that he saw the small emblem on the front of the sweater. He stated that the conversation with the defendant took close to two minutes, and that the lighting of the place where the defendant accosted him was bright; that he identified the defendant by his face and by the way he talked.

The witness was then cross-examined as to statements made by him at the preliminary hearing where he said the entire matter between him and the defendant happened in less than a minute. At that hearing he also stated that the defendant was wearing the sweater when he was at the hospital.

Michael O'Shea testified that he was 15 years old, and was employed by St. Mel's School as a janitor and telephone receptionist. His testimony with reference to the incident in question was much the same as that of his brother; he said the defendant was wearing a black sweater about which there "was nothing noticeable." He testified as to the brightness of the lights at the place of the encounter.

Carol Bowman testified for the State that she was 23 years old, lived at 304 South Kildare, and worked at Goazer Print and Lithographer Company. She identified the defendant in court, stating that she had spoken to him before that time about joining a civil rights organization, A. C. T., but that he was not a member. She had know him from July until November of 1964 when he had come into the record shop where she worked with boys

and girls; that she tried to help keep them out of trouble, but that she did not date any of the boys. She testified that on the night in question the defendant came to her home, told her he had been in a fight at Van Buren and Keeler, where a boy had been shot, and asked her if he could leave his sweater there, saying he would come back for it. She said he did not leave a gun with her; he said he had gotten rid of it. She put the sweater in a drawer where it remained until October 30, when she went to the police with it because she had learned that one of the boys in the group ("Top Cat") had been arrested and that a girl named Irene was going to be arrested. She stated that she did not want them to go to jail for something she knew they had not done.

DEFENSE WITNESSES: Henrice Allen testified that she lived next door to the defendant; that on October 28 she saw him in his backyard about 5:00 p. m.; that in response to her request he had come to her apartment between 5:30 and 6:00 p. m., and cut her baby's hair, staying there about 30 minutes. She stated that he later went to the first floor to her sister's apartment where she knew he stayed until well after 6:00, and that he was wearing a maroon sweater with two stripes; that she had seen him wear a black sweater, but that People's Exhibit 2 was not it. On cross-examination she stated that the defendant had not cut her child's hair at any other time, but that she did not know exactly what day it was when he had cut it, only that it was in October. She testified that she did not see the color of the sweater, People's Exhibit 2; that the defendant had a black one, and that she saw him wearing it and a maroon sweater with gray and white stripes, but that she had not seen People's Exhibit 2 hanging in the backyard.

Sally Allen testified that she knew the defendant; that he lived next door to her; that on October 28, 1964, he had come to her place about 5:00 p. m., where her

214

two sons and a sister were with her; that he had been asked to cut her sister's baby's hair, and had stopped to see if the child was there or in the apartment upstairs. She stated that she went with him to her sister's apartment, but did not stay, and that the defendant returned to her place about 6:00 p. m., and trimmed her hair, then her sister's, after which he watched television for a time and left her place about 6:30 p. m. She stated that minutes after he left his sisters came in and said the police were in their backyard. She said she did not see the defendant again that night.

The witness testified that she was acquainted with the lounge at Keeler and Van Buren, and that it was no lighter than the usual lounge. She testified that the defendant was wearing a short-sleeved sweater, maroon with gray stripes down the front; that she could not tell if People's Exhibit 2 was the sweater he wore, but she remembered that he had one similar to it; and that she did not know what happened to that sweater. She stated that the defendant had cut her hair before the 28th of October, but she could not say what date it was. She testified that after she heard of his arrest she later heard information concerning the sweater, that it was supposed to have been a black one with a design on it.

Bessie Barnes testified that she was the mother of the defendant, and that her son had a black sweater with certain symbols on it, "something in the back like an eagle." She did not know whether or not People's Exhibit 2 was the one, but she thought her son's sweater was "red all over in the back." She said that about a week and a half before his arrest the defendant had washed the sweater and hung it on the line and she had not seen it since. She said, "I really did see the black sweater, the exhibit, hanging on the line," and that she saw the defendant hang it there; that it was there a couple of days and she did not know when it was taken down. She testified she did not mean the sweater hanging on the

215

line was the one which was People's Exhibit 2 in court; that the defendant had two sweaters, one of which was like the exhibit. She further testified that her son had been requested by one of the children to cut the baby's hair, and that he was then wearing a wine-colored sweater with gray figures down the front and sides.

The defendant took the stand on his own behalf and testified that he was 18 years old and was a student at John Marshall; that he left school at 2:45 p. m., and started to work at 4:00 p. m., at the Market Basket on West Madison Street, usually working until 9:00 p. m. He stated that on October 28, 1964, he left school early and went to some car lots before he went to the store, arriving there about 4:15, at which time he was told he was not needed that day, and he left about 4:20, reaching his home about 4:30. At his home he met Irma Marshall, a sister of Sally and Henrice Allen. He was then asked to cut the hair of Henrice's baby, which he did, then returned to Sally's apartment about 6:00 p. m. He knew the time because of the television programs. He then cut Sally's hair and Irma's. About 20 minutes before 7:00 p. m., he went to the corner of Kildare and Van Buren, had a conversation with another boy, then went to Keeler where the police had just driven away with a boy in the patrol wagon. He denied that he saw either Patrick or Michael O'Shea that night and denied the incident to which they both testified. He said he was wearing a brown hat and a maroon jersey with a gray streak on either side. He testified that he knew Carol Bowman, but that she was not a good friend; that he never dated her and had a girl friend of his own. He knew that Carol and Top Cat were friends and he thought Top Cat was about 21 years old. He said he owned a sweater similar to People's Exhibit 2, but that it was not his sweater; that his was black with red and white on the front and red and yellow on the back; that he last saw it ten months before when he had washed it and

hung it outside, about a week before October 28, 1964. He knew of no reason why Carol Bowman would testify that he went to her home and gave her a sweater; that he was not a member of A. C. T.; that he had been asked to join and had refused. He said he had never owned a gun. In answer to questions of the court he said that on October 28 he was glad he didn't have to work because he didn't feel well and felt dizzy. He was asked if he had a dizzy spell while he was cutting the hair and he answered: "The dizzy spell wasn't, I should have used another phrase because it was just, well a confused. I was a confused man."

Patrick O'Shea was recalled by the State as witness and testified that on October 28, 1964, at about 6:15 p. m., he saw the defendant; that he was in front of him, grabbed his arm, and asked where he was going; he then pulled a gun and demanded that the witness give him his jacket and whatever he had in his pocket. He stated that when he identified the defendant at the hospital he was wearing a black sweater, and that there was no doubt in his mind as to the identity of the defendant.

Patrick O'Shea was then called in rebuttal, and his testimony was the same as when he originally testified.

OPINION: In this court the defendant directs his argument principally to the matter of identification. He not only attacks the identification in the case before us but makes an attack upon the validity of all identification evidence. People v. Bailey, 90 Ill App2d 121, 234 NE2d 332, was a case very similar to the one before us. The defendant was represented by the same attorneys and made the same argument with reference to identification. In his opinion in the case Justice Schwartz said at page 124:

> "The testimony of the three witnesses who identified the defendant clearly supports the trial court's finding unless we adopt the view being urged upon us by the Public Defender with respect to the innate

217

weakness of a conviction based on identification. This is presented at length in his brief. While not saying so specifically, he would have us ignore the rule that the credibility of a witness is for the trier of fact to determine and that only in exceptional cases should a reviewing court disturb the jury or the trial court's decision.

. . . . . .

"The conclusion the defendant would have us reach is that such evidence is not trustworthy because certain cases have revealed erroneous identifications. What percentage such cases bear to the whole is unknown and in all probability unknowable.

. . . . .

"Nearly all evidence is produced through human beings and, as such, the weight to be accorded it is a matter of credibility to be determined by the jury. 1 Wigmore, Evidence § 26 (3rd ed (1940))."

In the instant case defense counsel in his brief also objects to the fact that there were several minor discrepancies in the evidence of Patrick and Michael O'Shea. The boys were 17 and 15 years old, respectively. In People v. Tolliver, 48 Ill App2d 402, 199 NE2d 68, (abst.), a case involving the testimony of two boys aged 12 and 14, it was argued as here that there were several discrepancies in their testimony. The court said: "It is our opinion that these lend credibility to their testimony. Two boys on an exciting occasion like this could hardly be expected to recall in complete detail all the events in question."

In People v. Scott, 38 Ill2d 302, 231 NE2d 441, the court said at page 305:

"Where, as here, the corpus delicti has been established and only a question of identification remains, the positive and unequivocal identification by a credible witness, who had a favorable opportunity for

218

observation, can be sufficient to support a conviction. (People v. Ashley, 18 Ill2d 272; see also People v. Jordan, 38 Ill2d 83.)

. . . . . .

"It was the function of the trial court as the trier of fact here to determine the credibility of the witness and its finding of guilty will be disturbed only where the evidence is so unreasonable, improbable or unsatisfactory as to leave a reasonable doubt as to the defendant's guilt. (People v. Washington, 27 Ill2d 104.) Here, no such doubt is raised."

In the instant case the evidence of identification was sufficient.

The defendant also attacks the testimony of Carol Bowman with reference to his giving her his sweater to keep for him. The black sweater with the unique emblem was turned over to the police by Carol Bowman and was introduced in the trial as People's Exhibit 2. This sweater keeps emerging constantly to the disadvantage of the defendant. It is admitted that he had such a sweater. His alibi witnesses admit it, but all of them denied that People's Exhibit 2 is the sweater which was owned by the defendant.

There appears to be nothing in the record to indicate that Carol Bowman would want to testify falsely against the defendant. Her explanation for the reason she testified was that she knew two other people had been accused of the offense and that she did not want them to go to jail when she knew who had committed the crime. Her explanation is believable.

The testimony of the alibi witnesses for the defendant was disbelieved by the trial court, and we think properly so. The judgment of the Circuit Court is affirmed.

Affirmed.

DRUCKER and ENGLISH, JJ., concur.